UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

RICHEKAD JEAN,

                Plaintiff,

v.

TRACY JOHNS et al.,

                Defendants.

_____/

Case No. 1:21-cv-432

Honorable Paul L. Maloney

**OPINION**

       This is an action brought by a foreign national who, at the time he filed his complaint, was serving a federal sentence at the North Lake Correctional Facility in Baldwin, Michigan..  The North Lake Correctional Facility is a private prison run by GEO Group, Inc. (GEO), under contract with the Federal Bureau of Prisons (BOP).  Petitioner has since been released from North Lake.  He is presently detained by Immigration and Customs Enforcement (ICE) in the Monroe County Jail pending deportation proceedings.

       Plaintiff's allegations relate to two incidents—one on April 24, 2019, and one on April 27, 2019—at the D. Ray James Correctional Facility in Georgia.  The D. Ray James Correctional Facility is also a private prison run by GEO under contract with the BOP.  On April 24, 2019, Captain J. Degener, an employee of GEO, slammed Plaintiff to the ground, put Plaintiff in a choke hold, and directed racial slurs at Plaintiff.  Petitioner contends that Defendant Degener used excessive force.

On April 27, 2019, Plaintiff ate a peach that had a worm, or worms, in it.  He claims that Defendant Ms. Dye, the food service director at the D. Ray James facility and also an employee of GEO, did not follow the necessary food safety protocols.

Plaintiff was eventually transferred to North Lake.  He included these allegations in a motion he filed in a habeas petition in the United States District Court for the Southern District of Georgia.  That court transferred the habeas petition here.  The excessive force and wormy peach claims were transferred as part of the habeas corpus action.

The Court concluded that the transferred action was not simply one habeas petition, it was two:  Plaintiff challenged two distinct disciplinary proceedings and two separate sanctions that included loss of good conduct time credit.  The Court severed the habeas proceedings from each other and Plaintiff's excessive force and wormy peach claims from the habeas proceedings.  The Court directed Petitioner to file an amended complaint as part of the severance.  Petitioner filed his amended complaint on June 10, 2021.

Less than two months after Plaintiff filed the amended complaint, he was released.  Plaintiff did not promptly notify the Court of his new address; so the Court dismissed the complaint without prejudice for want of prosecution.  (Order & J., ECF Nos. 12, 13.)

Plaintiff has now filed two motions for reconsideration.  (ECF Nos. 14, 15.)  He reports that he was in transit and was not able to report his eventual placement—the Monroe County Jail—until a couple of weeks after he was released.  Then, apparently, Plaintiff erroneously reported his new address to the United States District Court for the Eastern District of Michigan rather than this Court.  (ECF No. 15-1, PageID.132.)  Petitioner asks the Court to reconsider the dismissal.

The Court construes Plaintiff's motions as motions to alter or amend judgment under Federal Rule of Civil Procedure 59(e). As the Sixth Circuit summarized in *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 833–34 (6th Cir. 1999), motions to alter or amend judgment under Rule 59(e) may be granted if there is a clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent manifest injustice. *See also ACLU v. McCreary Cnty.*, 607 F.3d 439, 450 (6th Cir. 2010). Although it is a close question, the Court will reconsider the order and judgment dismissing the complaint for want of prosecution. The Court will vacate the order and judgment because dismissal for want of prosecution under the circumstances present here may be manifestly unjust.

Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint, at least the federal claims, for failure to state a claim. The Court will dismiss Plaintiff's state law claims without prejudice because the Court declines to exercise supplemental jurisdiction over them.

## Discussion

### I. Factual allegations

The facts underlying Plaintiff's complaint are described above. He sues Defendant Degener for use of excessive force and Defendant Dye for running a food service that served Plaintiff a wormy peach. Plaintiff names two other defendants. Plaintiff names as a defendant

3

Tracy Johns, warden at the D. Ray James Correctional Facility.  He is also an employee of GEO. Plaintiff does not explain why Defendant Johns is named in the complaint.  Plaintiff notes that Johns was the warden and that he was present at the facility at the time of both incidents.  Plaintiff also states that GEO has failed to properly train and supervise its employees in the use of force and in food handling and food safety protocols.  In addition, Plaintiff attaches administrative grievance responses authored by Defendant Johns.  (ECF No. 11-2, PageID.98, 105.)

Plaintiff also names Defendant Tony Norman, a monitor employed by the BOP. Plaintiff alleges that Mr. Norman was present at the D. Ray James Correctional Facility at the time of both incidents.  Plaintiff also states that "as a direct result of [Defendant Norman's] negligent act or omission he caused Cpt. J. Degener to assault me and to be Food Poisoned by Ms Dye." (Compl., ECF No. 11, PageID.91–92.)  Plaintiff does not identify the "negligent act or omission."

The Court's docket also shows GEO and the BOP as Defendants.  Those entities are mentioned in the caption of the amended complaint, but they are not listed in the "Parties" section of the form complaint.  There, Plaintiff names only the four individual Defendants.  "Geo Corp." is mentioned three times in the caption, once after each Defendant who is employed by GEO.  "Federal Bureau of Prisons" is mentioned once, after Plaintiff lists the name of the Defendant who works for the BOP.  The Court concludes that the references to GEO and the BOP in the caption are merely included as descriptors of the employer of each individual Defendant. Accordingly, Plaintiff has not named them as parties.  The Court will direct the Clerk to remove "GEO Corporation" and the "Federal Bureau of Prisons" as Defendants.

## II.    Venue

When Plaintiff filed his amended complaint, it was apparent that there was no meaningful connection to this district.  The habeas petitions were properly transferred here, but the excessive force and wormy peach claims were not.  The incidents occurred in the Southern

4

District of Georgia; therefore, venue was proper there under 28 U.S.C. § 1391(b)(2).  Moreover, the Defendants were all there too—at least they were when the incidents occurred.  Plaintiff alleges that Defendants Johns and Dye are now employed by GEO in this district at the North Lake Correctional Facility.  Because an argument can be made that venue is proper here under 28 U.S.C. § 1391(b)(3), the Court will address Petitioner's claims rather than transferring them back to the United States District Court for the Southern District of Georgia.

### III.     Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the

*Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

## IV.    *Bivens* **claims**

In the amended complaint, Plaintiff offers allegations regarding the use of force, the wormy peach, and the harms that resulted from both incidents, but he does not clearly identify the nature of the claims he is bringing.  It is possible that Plaintiff is attempting to raise a claim for an alleged violation of his Constitutional rights under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).  In *Bivens*, 403 U.S. 388, the Supreme Court recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.  *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).  This implied cause of action is "the federal analog to suits brought against state officials" under 42 U.S.C. § 1983.  *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006).

"Under Bivens, a plaintiff must initially demonstrate (1) a challenged action attributable to a person acting under color of federal law, and (2) conduct that deprives the party of a constitutionally protected interest."  *Left Fork Mining Co. v. Hooker*, 775 F.3d 768, 774 (6th Cir. 2014) (citing *Schweiker v. Chilicky*, 487 U.S. 412, 418-21 (1988)).  "If those elements are satisfied, the Court then proceeds to a two-step inquiry to ascertain whether a *Bivens* damages remedy should be inferred."  *Left Fork*, 775 F.3d at 774 (citing *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)).

"A *Bivens* remedy is available only if (1) there are no 'alternative, existing process[es]' for protecting a constitutional interest and, (2) even in the absence of an alternative, there are no 'special factors counselling hesitation before authorizing a new kind of federal litigation.'"  *Left Fork*, 775 F.3d at 774 (quoting *Wilkie*, 551 U.S. at 550).  "When the design of a Government program suggests that Congress has provided what it considers adequate remedial

mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies." *Schweiker*, 487 U.S. at 423. Thus, "[s]o long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001) (citation omitted).

Here, Plaintiff sues three employees of a private company, GEO, and one employee of the BOP. *Bivens* does not permit suit against individual employees of private entities, *see Minneci v. Pollard*, 565 U.S. 118, 131 (2012). Thus, *Bivens* does not permit an action against Defendants Johns, Degener, or Dye.[1] In *Malesko* and *Minneci*, the Supreme Court noted that state-law tort remedies offer "adequate alternative remedies" that provide "roughly similar incentives for potential defendants to comply with [the Constitution] while also providing roughly similar compensation to victims of violations." *See Minneci*, 565 U.S. at 127, 130. The same is true here. Plaintiff can seek relief for the harms Defendants Johns, Degener, and Dye have done to him by bringing tort claims in state court.

Plaintiff could bring a *Bivens* claim against Defendant Norman as an officer of the BOP. But Plaintiff has failed to state a *Bivens* claim against Defendant Norman. Presumably, Plaintiff would claim that Norman is somehow responsible for the Degener's assault and Dye's wormy peach and that those incidents violated the Cruel and Unusual Punishments Clause of the Eighth Amendment.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it

---

[1] It is also noteworthy that *Bivens* does not permit suit against a federal agency, *FDIC v. Meyer*, 510 U.S. 471, 485-86 (1994), or against private entities acting under color of federal law, *Malesko*, 534 U.S. at 70-74. Thus, to the extent Plaintiff intended to name the BOP or GEO as defendants, he failed to state a *Bivens* claim against them.

contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate

8

health or safety." *Id.* at 837.  "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842.  "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

But Plaintiff does not allege that Norman was deliberately indifferent; he alleges that Norman committed "a negligent act or omission."  That is not enough to state a claim for liability under the Eighth Amendment.  *See Malesko*, 534 U.S. at 523 ("[D]eliberate indifference describes a state of mind more blameworthy that negligence.") (quoting *Farmer*, 511 U.S. at 835, internal quotes omitted).  Plaintiff therefore has failed to state an Eighth Amendment *Bivens* claim against Defendant Norman.

Accordingly, the Court will dismiss Plaintiff's *Bivens* claims against Defendants Johns, Degener, Dye, and Norman.

## V.    Alien Tort Statute

Plaintiff was a little more forthcoming regarding the basis for his lawsuit in the initial "complaint."  In that pleading, Plaintiff stated that he was proceeding pursuant to the Alien Tort Statute (ATS), 28 U.S.C. § 1350.  That statute provides:  "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." *Id.*  "[T]he ATS, by no means, supplies jurisdiction over every wrong committed against an alien." *Taveras v. Taveraz*, 477 F.3d 767, 771 (6th Cir. 2007).

In *Jesner v. Arab Bank, PLC*, 138 S.Ct. 1386 (2018), the Supreme Court provided a useful history of the ATS:

Under the Articles of Confederation, the Continental Congress lacked authority to "'cause infractions of treaties, or of the law of nations to be punished.'" *Sosa v. Alvarez–Machain*, 542 U.S. 692, 716 (2004) (quoting J. Madison, Journal of the Constitutional Convention 60 (E. Scott ed. 1893)). The Continental Congress urged the States to authorize suits for damages sustained by foreign citizens as a result of violations of international law; but the state courts' vindication of the law of nations remained unsatisfactory. Concerns with the consequent international-relations tensions "persisted through the time of the Constitutional Convention." 542 U.S., at 717.

Under the Articles of Confederation, the inability of the central government to ensure adequate remedies for foreign citizens caused substantial foreign-relations problems. In 1784, the French Minister lodged a protest with the Continental Congress after a French adventurer, the Chevalier de Longchamps, assaulted the Secretary of the French Legation in Philadelphia. *See Kiobel*, 569 U.S., at 120. A few years later, a New York constable caused an international incident when he entered the house of the Dutch Ambassador and arrested one of his servants. *Ibid*. Under the Articles of Confederation, there was no national forum available to resolve disputes like these under any binding laws that were or could be enacted or enforced by a central government.

The Framers addressed these matters at the 1787 Philadelphia Convention; and, as a result, Article III of the Constitution extends the federal judicial power to "all cases affecting ambassadors, other public ministers and consuls," and "to controversies . . . between a state, or the citizens thereof, and foreign states, citizens, or subjects." § 2. The First Congress passed a statute to implement these provisions: The Judiciary Act of 1789 authorized federal jurisdiction over suits involving disputes between aliens and United States citizens and suits involving diplomats. §§ 9, 11, 1 Stat. 76–79.

The Judiciary Act also included what is now the statute known as the ATS. § 9, *id*., at 76. As noted, the ATS is central to this case and its brief text bears repeating. Its full text is: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

The ATS is "strictly jurisdictional" and does not by its own terms provide or delineate the definition of a cause of action for violations of international law. *Sosa*, 542 U.S., at 713–714. But the statute was not enacted to sit on a shelf awaiting further legislation. *Id*., at 714. Rather, Congress enacted it against the backdrop of the general common law, which in 1789 recognized a limited category of "torts in violation of the law of nations." *Ibid*.

In the 18th century, international law primarily governed relationships between and among nation-states, but in a few instances it governed individual conduct occurring outside national borders (for example, "disputes relating to prizes, to shipwrecks, to hostages, and ransom bills"). *Id*., at 714–715 (internal

quotation marks omitted).  There was, furthermore, a narrow domain in which "rules binding individuals for the benefit of other individuals overlapped with" the rules governing the relationships between nation-states.  *Id.*, at 715.  As understood by Blackstone, this domain included "three specific offenses against the law of nations addressed by the criminal law of England: violation of safe conducts, infringement of the rights of ambassadors, and piracy."  *Ibid.*  (citing 4 W. Blackstone, Commentaries on the Laws of England 68 (1769)).  "It was this narrow set of violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs, that was probably on the minds of the men who drafted the ATS."  542 U.S., at 715.

This history teaches that Congress drafted the ATS "to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations."  *Id.*, at 720.  The principal objective of the statute, when first enacted, was to avoid foreign entanglements by ensuring the availability of a federal forum where the failure to provide one might cause another nation to hold the United States responsible for an injury to a foreign citizen.  *See id.*, at 715–719; *Kiobel*, 569 U.S., at 123–124.

Over the first 190 years or so after its enactment, the ATS was invoked but a few times.  Yet with the evolving recognition—for instance, in the Nuremberg trials after World War II—that certain acts constituting crimes against humanity are in violation of basic precepts of international law, courts began to give some redress for violations of international human-rights protections that are clear and unambiguous.  In the modern era this began with the decision of the Court of Appeals for the Second Circuit in *Filartiga v. Pena-Irala*, 630 F.2d 876 (1980).

In *Filartiga*, it was alleged that a young man had been tortured and murdered by Paraguayan police officers, and that an officer named Pena-Irala was one of the supervisors and perpetrators.  Some members of the victim's family were in the United States on visas.  When they discovered that Pena-Irala himself was living in New York, they filed suit against him.  The action, seeking damages for the suffering and death he allegedly had caused, was filed in the United States District Court for the Eastern District of New York.  The Court of Appeals found that there was jurisdiction under the ATS.  For this holding it relied upon the universal acknowledgment that acts of official torture are contrary to the law of nations.  *Id.*, at 890.  This Court did not review that decision.

In the midst of debates in the courts of appeals over whether the court in *Filartiga* was correct in holding that plaintiffs could bring ATS actions based on modern human-rights laws absent an express cause of action created by an additional statute, Congress enacted the Torture Victim Protection Act of 1991 (TVPA), 106 Stat. 73, note following 28 U.S.C. § 1350. H.R. Rep. No. 102-367, pp. 3–4 (1991) (H.R. Rep.) (citing *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (C.A.D.C. 1984)); S. Rep. No. 102-249, pp. 3–5 (1991) (S. Rep.) (same). The TVPA—which is codified as a note following the ATS—creates an express cause

of action for victims of torture and extrajudicial killing in violation of international law.

After Filartiga and the TVPA, ATS lawsuits became more frequent. Modern ATS litigation has the potential to involve large groups of foreign plaintiffs suing foreign corporations in the United States for alleged human-rights violations in other nations.  For example, in Kiobel the plaintiffs were Nigerian nationals who sued Dutch, British, and Nigerian corporations for alleged crimes in Nigeria.  569 U.S., at 111–112, 133 S.Ct. 1659.  The extent and scope of this litigation in United States courts have resulted in criticism here and abroad.  See id., at 124, 133 S.Ct. 1659 (noting objections to ATS litigation by Canada, Germany, Indonesia, Papua New Guinea, South Africa, Switzerland, and the United Kingdom).

In Sosa, the Court considered the question whether courts may recognize new, enforceable international norms in ATS lawsuits.  542 U.S., at 730–731.  The Sosa Court acknowledged the decisions made in Filartiga and similar cases; and it held that in certain narrow circumstances courts may recognize a common-law cause of action for claims based on the present-day law of nations, in addition to the "historical paradigms familiar when § 1350 was enacted."  542 U.S., at 732. The Court was quite explicit, however, in holding that ATS litigation implicates serious separation-of-powers and foreign-relations concerns.  Id., at 727–728. Thus, ATS claims must be "subject to vigilant doorkeeping."  Id., at 729, 124 S.Ct. 2739.

Jesner, at 1396–98.

The TVPA provides a civil action against individuals who commit certain acts:

(a) LIABILITY.—An individual who, under actual or apparent authority, or color of law, of any foreign nation—

（1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

 (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

Torture Victim Protection Act of 1991, Pub.L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

Plaintiff does not mention the TVPA in either the amended complaint or the initial "complaint."  Moreover, any claim under the TVPA would necessarily fail because there is no allegation that any of the Defendants acted "under  . . . authority . . .  of any foreign nation . . . ."

12

*Id.* Plaintiff does reference torture in his initial "complaint." But his brief description of being slammed to the ground, held in a choke hold, and subjected to a racial slur or his description of being negligently presented with a wormy peach fall far short of the TVPA's definition of torture.

Setting aside the shortcomings of Plaintiff's allegations under the TVPA, the alleged incidents do not otherwise fall within the narrow historical confines of the ATS. The alleged actions of Degener or inaction of Dye do not appear to implicate violation of safe conducts, infringement of the rights of ambassadors, or piracy. Accordingly, the Court concludes that Petitioner has failed to state a claim under the ATS as well.

## VI.    State-law claims

The crux of Plaintiff's complaint, therefore, would appear to be claims under Georgia state law against Johns, Dye, and Norman for negligence, and against Degener for an intentional tort. To the extent that Plaintiff seeks to invoke this Court's supplemental jurisdiction over a state-law claim, the Court declines to exercise jurisdiction. Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *See Experimental Holdings, Inc. v. Farris* 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims.") (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)); *see also Southard v. Newcomb Oil Co., LLC*, 7 F.4th 451, 455 (6th Cir. 2021) (citing *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (recognizing that once a federal court no longer has federal claims to resolve, it "should not ordinarily reach the plaintiff's state-law claims)); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against

13

needlessly deciding state law issues." *Landefeld*, 994 F.2d at 1182; *see also Moon*, 465 F.3d at 728 ("Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues.") (internal quotations omitted).  Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction.  Accordingly, Plaintiff's state-law claims will be dismissed without prejudice.

## Conclusion

The Court previously dismissed Plaintiff's claims for want of prosecution because he failed to timely apprise the Court of a new address after he was released from the North Lake Correctional Facility.  Plaintiff has moved to reconsider that decision.  After reviewing Plaintiff's recounting of the timeline that followed his release, the Court concludes it would be manifestly unjust to dismiss for want of prosecution under the circumstances present here.  Accordingly, the Court will grant Plaintiff's motions to reconsider (ECF Nos. 14 and 15) and vacate the Court's prior order and judgment dismissing the case (ECF Nos. 12 and 13.)

That leaves Plaintiff's amended complaint ripe for preliminary review under the PLRA.  Having conducted that review, the Court determines the following: (1) the Clerk shall remove GEO Corp. and the Federal Bureau of Prisons from the docket as Defendants; (2) Plaintiff has failed to state a claim under *Bivens*, the ATS, or the TVPA; and (3) the Court will not exercise supplemental jurisdiction over Plaintiff's state-law claims.  Plaintiff's federal claims will be dismissed with prejudice for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b),

and 42 U.S.C. § 1997e(c). Plaintiff's state law claims will be dismissed without prejudice because the Court declines to exercise jurisdiction over them.

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  For the same reasons the Court concludes that Plaintiff's claims are properly dismissed, the Court also concludes that any issue Plaintiff might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).  Accordingly, the Court certifies that an appeal would not be taken in good faith.

This is a dismissal as described by 28 U.S.C. § 1915(g).

An order and a judgment consistent with this opinion will be entered.


Dated:   September 28, 2021                        /s/ Paul L. Maloney
                                                   Paul L. Maloney
                                                   United States District Judge

15